| 92 | 75 |
| 40a | 648 |

| 92 | 75 |
| 184 | 537 |
| e185 | 434 |

| 92 | 75 |
| d207 | 220 |
| d207 | 221 |

## John B. Hunter

### *v.*

## Samuel G. Stoneburner.

1. PROCESS—*sufficiency of service.* A sheriff's return upon a summons on a petition for partition, issued under the laws in force in 1851, was: "I have executed this, the within writ, on A B, etc., children of C D, deceased, and E F, by reading, this 13th day of October, A. D. 1851:" *Held,* this was sufficient to show a valid service upon E F by reading the process to him, and to give the court jurisdiction of his person.

2. SAME—*impeaching officer's return of service.* It is in rare cases, only, that the return of an officer showing service of summons can be contradicted, other than in a suit against the officer for a false return. An exception to the rule is, where some other portion of the record contradicts the return, but the return can not be contradicted by evidence *dehors* the record.

3. Where a decree finds there was due service of process, it is binding, unless contradicted by the record itself; and such finding, as well as the officer's return, can not be impeached by the oath of the person on whom the service appears to have been made.

4. PURCHASER—*not affected by the fraud of his grantor.* A purchaser of land, without notice of any alleged fraud on the part of his grantor in certain

legal proceedings through which he acquired one-half of his title, and without notice of anything to put him upon inquiry to ascertain if there was any such fraud, will be protected in his purchase as against the person claiming to have been defrauded.

5. SAME—*what is notice of fraud in his grantor.* A purchaser of land will be presumed to have examined the title, and if there was anything in any link of the chain of title showing fraud, or such circumstances as would put a prudent man on inquiry for fraud, he will be charged with notice of fraud, if any existed.

6. TENANT IN COMMON—*right to partition not defeated by being made executor of his co-tenant's will.* Where one tenant in common of lands occupied in common devised his half interest therein to his son, and appointed the other tenant in common his executor, and gave directions that the personal property should remain on the land until the devisee should become of age, to be used by the executor as before, it was *held*, that the will created no other or different trust in the executor than that imposed on any other executor who has specific instructions in a will as to the management of the property of the estate, and did not have the effect of preventing the executor, as a co-tenant, from selling his half of the land, or from applying for and obtaining a partition.

7. But if a trust were created, the decree of a court of competent jurisdiction of the subject matter and of all parties in interest, while unreversed and standing in full force, in all collateral proceedings to avoid a sale made thereunder, will be conclusive of the right to have a partition.

8. DECREE—*purchaser need not go behind.* Upon a purchase of land from one who has derived title by a sale and conveyance under a decree for partition which finds that the land is not susceptible of division by approving the report of the commissioners to that effect, and ordering a sale, and a decree approving of the sale, no exceptions being taken to the report of sale for fraud by the guardian of an infant defendant, or his guardian *ad litem*, and the court having jurisdiction, the purchaser is not bound to look behind the decree to ascertain if the premises were susceptible of division, or whether the commissioners' report was procured by fraud, or whether the land sold for an adequate price, but he may rely upon the decree as *res adjudicata* as to such questions, and conclusive until set aside or reversed; and such proceedings afford no notice of fraud.

APPEAL from the Circuit Court of Bond county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Messrs. METCALF & BRADSHAW, and Mr. JOSEPH SHIPPEN, for the appellant.

Messrs. ROBINSON, KNAPP & SHUTT, Mr. DAVID GILLESPIE, and Mr. S. A. PHELPS, for the appellee.

Mr. Chief Justice Walker delivered the opinion of the Court:

John and William Stoneburner, of Bond county, in this State, owned, as tenants in common, 870 acres of land. They lived on the same and cultivated a portion of it. In the month of August, 1848, John died, leaving appellee, then nine years old, as his only heir. He had previously made a will, by which his brother William was appointed executor. The will was probated, and William took upon himself the burthen of settling the affairs of the estate.

Amongst other provisions the will contained this: "I do hereby devise and bequeath to my son, Samuel G. Stoneburner, all my real estate and personal property (except what money I may have on hand at the time of my death), all the personal property to be kept on the farm, in the hands of my executor, and to be used by him, as in my lifetime, on said farm until my son, Samuel G., shall arrive at the age of twenty-one years. In case my son, Samuel G., should die without children, it is my will that all of my real estate and personal property should, in that case, be equally divided between my brother William Stoneburner, Jacob Stoneburner, the son of my brother Jacob, and the children of my sister, Frances Dennis, which children are named as follows: Callender L. Dennis, Virginia C., William A., Frances C., and Olivia A. Dennis."

In 1849, John S. Hall was appointed and qualified as the guardian of appellee, and so acted during his minority. In October, 1851, William Stoneburner filed a petition for partition of the 870 acres of land owned by him and the devisee of his deceased brother, John, in the Bond county circuit court. A summons was issued, on which the sheriff made this return: "I have executed this, the within writ, on the within named Callender L. Dennis, Virginia C. Dennis, William A. Dennis, Frances C. Dennis, and Olivia J. Dennis, children of Frances Dennis, deceased, and Samuel G. Stoneburner, by reading, this 13th day of October, A. D. 1851; Jacob Stoneburner not

to be found in my county. October 17, A. D. 1851." Signed, "S. H. Crocker, sheriff."

The court appointed for appellee a guardian *ad litem*, who appeared and answered, requiring strict proof of the allegations of the petition. The case was heard, and the court decreed a partition of the lands, and appointed three persons to make and report a division. They reported, after taking the oath prescribed by the statute, that they had gone on the premises, and found they were not susceptible of division without manifest injury to the owners. This report was approved by the court, and a decree was thereupon passed ordering the sale of the lands, that there might be partition of the money arising from the sale, and the court appointed a special commissioner to execute the decree. The commissioner advertised and sold the land, and William Stoneburner, who owned the other half, became the purchaser, as the highest and best bidder, for the sum of $635, and received a deed for the premises. The commissioner reported the sale and conveyance to the court, and it was approved.

In March, 1852, William Stoneburner sold and conveyed the land to John B. Hunter, the appellant, for $6715, mostly on time, but $1000 in hand, $1000 in one year, $1000 in two years, $1700 in three years, and $2000 in nine years. In this sale to Hunter was included 80 acres in which appellee or his father had no interest; also, 17,000 rails, worth about $255. And the evidence shows that William placed about $1000 worth of improvements on the land after he purchased at the commissioner's sale, and before he sold to appellant. None of the deferred payments drew interest. The note last falling due was made payable to appellee after he arrived at age, and he collected it and entered satisfaction of the mortgage given on the land to secure its payment, after he was twenty-three years old.

In 1870, appellee filed this bill, to set aside the sale by the commissioner to William Stoneburner, and his sale to appellant; also, the proceedings in partition, charging that he was

not served with process; that William Stoneburner fraudulently procured the report of the commissioners that the land was not susceptible of division, and purchased the land in fraud of appellee's rights, and that appellant had notice of the fraud, and is not protected in his purchase. On a hearing in the court below the relief was granted as asked, and defendant brings the record to this court.

It is insisted that the return fails to show that the summons was read to appellee. We think this is clearly a misconception of its meaning. The sheriff says that he executed the writ on the defendants by reading, and giving the date of its execution. The language of the return might be transposed to state that he executed the writ by reading it to the within named defendants on the day named, but that would not more certainly show that it was read to them than does the language employed. This is its true meaning, and we think no other reasonable construction can be given to the language.

It, then, appearing that appellee was served with process, he must be bound by the officer's return. It is in rare cases only, that the return of the officer can be contradicted, except in a direct proceeding by suit against the officer for a false return. In all other cases, almost without an exception, the return is held to be conclusive. An exception to the rule is, where some other portion of the record in the same case contradicts the return, but it can not be done by evidence *dehors* the record. See *Botsford* v. *O'Conner*, 57 Ill. 72; *Barnett* v. *Wolf*, 70 id. 76; *Harris* v. *Lester*, 80 id. 307. And if this return was defective, the court in the decree finds there was due service of process, and that is binding unless contradicted by the record itself. It, as well as the return, can not be impeached by the oath of the person on whom the service appears to have been made.

If it were conceded, or proved, that William Stoneburner procured the report of the commissioners that the lands were not susceptible of division, and procured the order of sale of the land, and purchased it, by fraud, still that would

not, in the least, affect appellant's title, if he purchased in good faith without actual or constructive notice of the fraud. This is a rule that is found in all of the books, and has, so far as we know, never been controverted; and the rule is so eminently just and equitable, that we are unable to conceive that it ever can be controverted, with success. To hold otherwise would be flagrantly unjust and perpetrate monstrous injustice. If, then, appellee was a *bona fide* purchaser from William Stoneburner, he must be protected in his purchase.

We have carefully examined the entire record, in vain, to find the slightest actual notice of any fraud before appellant consummated the purchase. He bought the land of the person in whom the title stood, one-half by conveyances to him independent of the decree, and sale by the commissioner. The other half was in his grantor by a sale under the decree of the court, made by its commissioner and approved by the court. There is no witness who says that he or any one else notified him, as a fact or as a rumor, that there was any fraud or the least suspicion of a fraud. He denies all, or any such notice, in the most positive terms, and his evidence seems to be fair, consistent and truthful. He lived, at and before the purchase, some five or six miles from the land, and is not, therefore, presumed to have known of the neighborhood comments on the transaction, if there were such. There is not, therefore, the slightest pretense for saying he had actual notice, or so far as we can see, that any person informed him of any fact that, as a prudent man, required him to make inquiry. He purchased, paying the fair market value of the land, without actual notice of any fraud or pretense of fraud. This the evidence undoubtedly shows. Purchasing then without any notice of what is claimed to be a fraudulent arrangement between William Stoneburner and Hall, the guardian, or the claim that the former procured by fraud a false report of the commissioners, or any other arrangement or fraudulent act, he must be protected unless there be something in the record of the partition proceeding which was sufficient to put him on in-

quiry and charges him with notice of the fraud, if there was any.

But, it is claimed that he is held to have examined the title to the land he was proposing to purchase, and if there was anything in any link in the chain of title that showed fraud, or such circumstances as would put a prudent man on inquiry for fraud, that he is then charged with notice of fraud if it existed. This is no doubt true. It is urged that the will and the proceedings in partition contained evidence of fraud on the part of William Stoneburner, or at least enough to put appellant on inquiry and charge him with notice of the fraud to which they pointed.

It is first said that William Stoneburner was a trustee of appellee, and that it was a fraud to partition the land or procure a sale in such a proceeding, and that the will shows that fact. On turning to the will we find that it conveys no title in the land to William, nor does it profess to transfer to him any interest in the land, but it gives and devises John's half to appellee. It is true, that the will requires the personal property to remain on the land until appellee arrived at the age of twenty-one years, to be used by William as it was in the testator's lifetime. We fail to see that it created any other or different trust than is imposed on any other executor who has specific instructions in the will for the management of the estate and property. Testator could not, by his will, prevent his co-tenant in common from selling his half of the land, nor could he prevent him from applying for and obtaining a partition.

But, if it were conceded that William Stoneburner did thereby become a trustee, and appellant doubted his right to have partition or sale of the land, and he sought information, where else should he have gone but to the records of the court in the partition suit? If he had gone there he would have found that the court, having competent jurisdiction of the subject matter and of all parties in interest, had solemnly decided and decreed that if William was a trustee, it was not a

6—92 ILL.

fraud upon or a violation of that trust to obtain a partition, or, if that could not be made, then a sale of the land, for the court had solemnly decreed the partition, and that failing, that the land be sold. And on a sale under the decree being reported it was affirmed. Had he made inquiry this would have been the result, and this action of the court remaining in full force would have dispelled all doubts as to William's power to procure a partition or sale under the statute. There is no force in this position.

But it is said, here was a large tract of land susceptible of division, which had been sold because these commissioners had reported it could not be partitioned, and that should have put him on inquiry. Suppose he had made inquiry, where should he have gone for information? To the records of the court, of course. And what would he have found there? He would have found that three men, selected by the court because of their integrity, standing, judgment and business qualifications, had reported that it was not susceptible of division. Their report might not have satisfied him that it could not be partitioned, but when he found the court had received this report and approved it, and had, when the question was properly before it for decision, solemnly adjudged that the land could not be divided, and, for the reason it could not, had decreed the sale of the land, was he required to go behind that decision to find grounds to say the court had not rendered a proper decision? Surely not. He found the decree and it was in full force, and he had the right to act upon it as *res adjudicata*. He was bound to look no further. He had the right to suppose the approval of the report by the court was conclusive, and that he could safely act on it as such.

It is also urged, that the price at which so large a tract of land was sold was evidence to put appellant on inquiry for fraud. If he had examined the records, he would have found that the commissioner through whom the court made the sale reported the sum bid, the person who purchased, and the manner in which he had executed the decree. And he would

have found, when the question was presented for decision whether the sale should be affirmed notwithstanding the smallness of the price, the court had solemnly decided the requirements of the law had been complied with, and confirmed the sale.   If these circumstances excited no belief in the mind of the court that there was fraud in procuring the report and the purchase of the land, when called on to ratify and confirm them by the deliberate judgment of the court, why should they have charged appellant with notice of fraud, if any existed? He would also have found that appellee had a guardian *ad litem* whose duty it was to protect his interests, and who had interposed no objections.   He would also have found that Hall was his guardian and bound to see that the interests of his ward were protected, and who had made no opposition to the proceeding.

How, then, was appellant charged with any fraud from these proceedings?   Was he bound to believe the three commissioners appointed by the court, the guardian *ad litem*, the guardian appointed by the probate court as a suitable person to have charge of the person and to manage the estate of appellee, and William Stoneburner, were all bad, corrupt men, in league with each other to defraud appellee of his property?   If so, where was the evidence charging the fact or the circumstances leading to that belief and requiring investigation by the most prudent?   Legal proceedings and the judgments, orders and decrees of courts, solemnly made, are entitled to a larger amount of confidence in their stability than to suppose they may be abrogated and set aside upon the facts appearing of record in that case.   This is what appellee insists appellant should have believed of these decrees and proceedings.

It is again urged that the manner in which the note was given by appellant to appellee was unusual, and sufficient to put him on inquiry for fraud.   It is true, this note ran nine years without interest until after maturity.   So did the others which fell due at shorter periods.   So, the peculiarity of the note was not that it did not draw interest, but that it ran an

unusual length of time before maturity. Appellant says that William Stoneburner informed him that appellee was entitled to the money named in the note, but did not inform him in what manner he became so entitled. Suppose he had inquired, and Stoneburner had said he had bought the land at the commissioner's sale and thereby acquired an indefeasible title to it, and could hold the entire proceeds of the sale; but as appellee's half which I purchased at the sale belonged to his father, and I purchased for less than it was worth, and I am giving him the benefit of the enhanced price I am getting from you, and am thus securing it to him,—would that have been evidence of fraud? It would have been evidence to the contrary. It would have manifested a disposition to treat appellee fairly, and not fraudulently, and had appellant made the inquiry, William would no doubt have given substantially the information we have supposed, as he did so to others; and when we look to the evidence, we find that appellee got his full share of the advanced price of the land.

It appears that William placed improvements on the land to the amount of $1000, and 17,000 rails worth about $255 were included, and there was included in the sale to appellant 80 acres, in which appellee never had any interest, which at the price paid, $7 per acre, would be $560, aggregating $1815, which, taken from the $6715 appellant paid, leaves $4900, which divided leaves $2450, and Hall swears he paid appellee from the land $2450. So he has, in fact, received one-half of the proceeds of the sale, saying nothing of board, and money advanced for his schooling, which is probably equal to or more than the interest accrued on appellant's notes. But be that as it may, appellant is not chargeable with William's failure to divide the proceeds of the sale, as he promised Hall and said to some of his neighbors that he would. But Hall testifies he did, on settlement, give appellant one-half of the proceeds of the land after making these deductions.

A careful examination of the record fails to show that appellant committed any fraud, or if there was fraud, that he had

actual or constructive notice of it, and he must be protected in his purchase.

The view we have here taken of the case renders the discussion of other questions presented and discussed unnecessary.

The decree of the court below is reversed.

*Decree reversed.*