HARJO v. JOHNSTON et al.

No. 25209. March 26, 1940.

Rehearing Denied July 16, 1940.

*104 P. 2d 985.*

Chas. B. Rogers and E. O. Patterson, both of Tulsa, (W. M. Gulager and John D. Gulager, both of Muskogee, of counsel), for plaintiff in error.

Goode, Dierker & Goode, of Shawnee, for defendant in error Willard Johnston.

Hayes, Richardson, Shartel, Gilliland & Jordan, of Oklahoma City, for defendant in error Kingwood Oil Company.

Hunter L. Johnson, Hunter L. Johnson, Jr., and Theodore Rinehart, all of Tulsa, for defendant in error Provident Royalty Corporation.

Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., for defendant in error Shell Petroleum Corporation.

WELCH, V. C. J. In this appeal the parties are in the same relative position as in the trial court and will be hereafter referred to as plaintiff and defendants.

The cause proceeded to trial upon plaintiff's amended petition, filed on April 15, 1932. Therein plaintiff alleged, in substance, the following:

That plaintiff is the owner of an undivided two-thirds of certain lands by inheritance from Louis Harjo and his heirs. The land in controversy was allotted to Louis Harjo, a full-blood Seminole Indian, who was the son of Oche and Judy Harjo. Oche Harjo died intestate prior to allotment, leaving as his heirs Judy, his widow, and Jimmy and Louis Harjo, his sons by Judy, and Nellie White and Eplumke, his daughter and son by Lucy, a predeceased wife. Louis Harjo died in November, 1903, unmarried and intestate, and left as his heirs Judy Harjo, his mother, and Jimmy Harjo, his brother, Nellie White, his half sister, and the heirs of his deceased half brother, Eplumke, who inherited the following interests in Louis' allotment, to wit: Judy, his mother, one-half; Jimmy, his brother, one-sixth; Nellie White, his sister, one-sixth; and the heirs of Eplumke, one-sixth. Jimmy Harjo died intestate in December, 1906, and left as his heirs Eliza Harjo, his wife, and the plaintiff, Edmond Harjo, his son. Judy Harjo died intestate in December, 1907, and left as her only heir, plaintiff, Edmond Harjo, her grandson.

That on February 9, 1919, Edmond Harjo, then a minor, by D. A. Long, his guardian, commenced his action for partition in the district court of Seminole county, cause No. 4155, wherein Willard Johnston, one of the defendants here, was defendant. In his petition the said Edmond Harjo claimed an undivided three-eighths interest in the land, the allotment of his uncle, Louis Harjo. That the cause was set for trial and tried on January 9, 1920, before said court, organized and presided over by the regularly elected and qualified judge of that district; that no judgment or decree was ever made or entered by said court. That thereafter, on March 8, 1920, a purported judgment and decree was signed by an assigned judge, wherein Edmond Harjo was decreed to be the owner of an undivided one-eighth interest in the land, and Willard Johnston, the owner of the remaining seven-eighths interest. That no trial was had before the assigned judge and that the decree was signed by him while said cause was pending in said court, where the same was tried before the regular judge of the district.

The petition further alleged that the signature of said assigned judge to the decree was procured irregularly and fraudulently and without any trial or

the presentation of any evidence upon the issues in controversy; that such purported decree was in fact nothing more than a compromise of the suit and of the interest of the minor, and if the court presided over by the said assigned judge had jurisdiction in the premises, the manner in which said judgment was procured amounted in law to a fraud upon the court and the minor plaintiff.

That there was a pretended sale of said premises as in partition under said purported judgment, and that the defendant, Willard Johnston, with knowledge that said judgment was fraudulently obtained and with knowledge of the irregularity and illegality of said subsequent sale, actively participated therein for the purpose of fraudulently attempting to acquire plaintiff's interest in the land. That his pretended purchase was not valid and his claim of ownership of the whole of plaintiff's interest in said land was by virtue of said unlawful proceedings.

That under and by virtue of said proceedings and said pretended sale and subsequent conveyances purported to have been executed by Willard Johnston, all the other defendants claim some right, title, or interest in said lands adverse to the plaintiff.

Plaintiff also alleged that he first discovered the matters and things alleged relating to the procurement and entering of the purported judgment of March 8, 1920, on or about March 31, 1931.

Plaintiff prayed that the judgment dated March 8, 1920, be adjudged wholly void and of no effect; that all the defendants be perpetually enjoined from asserting against him any right, claim, or interest under and by virtue of said purported judgment and subsequent orders and proceedings based thereon, and that plaintiff's interest in said land be determined.

In their separate answer the defendants denied generally the allegations of plaintiff's petition, except for certain admissions.

Defendants admitted that the land in controversy was allotted to Louis Harjo, but denied certain allegations of heirship and family history contained in plaintiff's petition.

Defendants averred that Louis Harjo was the son of Oche and Lucy Harjo, and not of Judy Harjo, as plaintiff contended; that Oche had a third wife, Togie, and a son by that marriage named Chilley Ross; that Louis Harjo died in 1903, unmarried and intestate; that he left no descendants and was predeceased by both his father and his mother; that he left as his sole heirs his full brother, Eplumke Harjo, who inherited an undivided five-eighths of his allotment; Nellie White, his paternal half sister, who inherited an undivided one-eighth thereof; Chilley Ross, a paternal half brother, who inherited an undivided one-eighth thereof, and Jimmy Harjo, a paternal half brother, who inherited an undivided one-eighth thereof; that plaintiff was Jimmy's son, and plaintiff's interest in Louis' allotment was no more than the one-eighth interest inherited from his father and that subject to his mother's dower interest.

Defendants admitted plaintiff's institution in the district court of Seminole county of the suit against Willard Johnston for partition of said land, but denied that the cause was tried or submitted to the regular judge of the district on, before, or after January 9, 1920.

Defendants assert the validity of the judgment rendered by the assigned judge on March 8, 1920, and deny that there was no hearing before said judge and that no testimony was offered or taken.

Defendants denied that there was any fraud, irregularity, or improper conduct on the part of any one in the procurement of the judgment of March 8, 1920, or in the related subsequent proceedings, and averred that for more than two years prior to the filing of this suit, plaintiff had full knowledge of the facts and circumstances in connection with the procurement of said judgment; that plaintiff had theretofore, and more than two

years prior to the filing of this cause, filed certain motions in said partition suit in the district court attacking the validity of the proceedings, which motions were denied by the courts and the orders denying said motions had become final.

In addition to their plea of the statutes of limitation, defendants plead that they are innocent purchasers: that plaintiff received and retained that portion of the proceeds of the partition sale awarded to him, and thereby ratified the proceedings; that at the time of said partition proceedings the land was of little value and subsequent thereto and prior to the filing of this suit defendants have expended large sums in developing the premises, which has increased the value thereof, and that plaintiff is barred by laches.

The replies of plaintiff deny the affirmative matter set up by defendants to defeat his suit, and particularly deny that Louis Harjo was a son of Lucy Harjo and that Chilley Ross was an heir of Louis Harjo.

Upon the issues so joined the cause was heard upon the evidence and judgment rendered for the defendants. The plaintiff appeals and presents 13 assignments of error. The defendants present 17 propositions in support of the judgment. At the request of both parties the trial court made several separate findings of fact and conclusions of law.

The plaintiff's assignments, the defendants' propositions, and the court's findings will be discussed together or separately and in such order as seems most convenient.

In the findings of fact and conclusions of law the trial judge made these statements:

"I am of the opinion that the crux of this lawsuit is the validity of the judgment and proceedings in No. 4155 aforesaid, and particularly as to the fact of that cause being submitted to District Judge Bolen; and,

"The testimony presented to show that this cause was submitted to Judge Bolen is so vague and uncertain as to prevent this court from finding that the cause was ever submitted to Judge Bolen."

Our review of the record has brought us to the same conclusion with reference to the cause having been submitted to Judge Bolen. Concerning the judgment rendered on March 8, 1920, the trial court said:

"This is true also as to the assertion that no testimony was given to justify the judgment. The judgment says there was, no one has testified there was not."

With this statement and the finding that the judgment in cause No. 4155 is valid, we cannot agree.

The record discloses that cause No. 4155 was set for trial on January 6, 1920, and on that day continued until January 9, 1920; that witnesses were subpoenaed by both the plaintiff and defendants to appear in said cause on January 9, 1920; that a journal entry was prepared prior to or on January 9, 1920, with the signed approval of the attorneys for each side appearing thereon, which journal entry decreed the plaintiff to be the owner of an undivided one-eighth interest in the Louis Harjo allotment; that said journal entry was the same as that signed by Judge Johnson on March 8, 1920, with the exception that the date January 9, 1920, was stricken and the date March 8, 1920, was interlined thereon; that the court clerk of Seminole county had prepared a trial docket of cases set for trial in the district court of Seminole county on March 8, 1920; that cause No. 4155 was not on said trial docket; that no witnesses were subpoenaed in said cause for that day; that the government census records then extant showed Judy to be the mother of Louis Harjo, and Louis Harjo and plaintiff's father, Jimmy Harjo, to be full brothers.

The record further discloses that Judge Johnson signed the journal entry of March 8, 1920, upon the statement of plaintiff's counsel alone; that said coun-

sel had no personal knowledge of the relationship of the Harjo family; that plaintiff's counsel was familiar with the government records pertaining to the Harjo family; that said government records were not introduced in evidence nor was the information therein contained included in plaintiff's counsel's statement to the court.

(Surely said conduct prevented this minor plaintiff from having his interests fairly presented or fully considered by the court.) Syllabus 3, supra.

These records were made by the Commission to the Five Civilized Tribes pursuant to an act of Congress wherein it was provided:

"Said commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified, and it is authorized to take a census of each of said tribes, or to adopt any other means by them deemed necessary to enable them to make such rolls. * * *

"The members of said commission shall, in performing all duties required of them by law, have authority to administer oaths, examine witnesses, and send for persons and papers. * * *" Act June 28, 1898, § 21, 30 Stat. 502.

It is undisputed that Louis Harjo was born some 40 years prior to 1920. Upon a hearing to determine the heirs of Louis Harjo in 1920, many years after his death, and after the death of his parents, the strong probative force of these government records, made during his lifetime and long prior to 1920, appears most obvious.

Prior to 1920 the probative value of such records under such circumstances was noted by the federal courts; See Folk et al. v. United States et al., 233 Fed. 191; United States v. Bessie Wildcat et al., 244 U. S. 111, 61 L. Ed. 1025; and in 1922, this court in the case of Page v. Atkins, 86 Okla. 290, 208 P. 807, with reference to the census cards made by the Commission to the Five Civilized Tribes, said:

"This card is in effect a description of a citizen which the commission had adjudicated was entitled to be enrolled upon the final approved rolls of the commission as a citizen of one of the Five Civilized Tribes. The information furnished on this card, such as the sex, age, and parentage of the citizen, is descriptive matter, and there may appear an error as to one or more of these descriptive words which would not destroy the identity of the citizen. But considering the fact that these descriptive words were placed upon this record pursuant to a statutory duty as a matter of evidence, they are entitled to great weight, and cannot and will not be ignored in the absence of strong and convincing evidence to the contrary."

From the facts above enumerated as disclosed by the record we are convinced that there was no judicial determination of the issues in cause No. 4155 on March 8, 1920, that there was no competent evidence presented; that judgment was entered upon statement of counsel for the guardian, which statement ignored the government records and all other evidence that might show the minor's interest in the property in controversy to be greater than one-eighth, and contained only an offer of such evidence as would support a compromise and agreement between the guardian for the minor and the defendant, wherein it was agreed that the minor's interest should be determined at one-eighth.

In the case of In re Sanders' Estate, 67 Okla. 3, 168 P. 197, in the second paragraph of the syllabus is found the following expression of this court:

"It is the duty of courts to guard with jealous care the interests of minors in actions involving their rights. No presumption can be permitted against an infant, but, on the contrary, every presumption must be indulged in his favor, and a guardian ad litem or other person representing such minor must see to it that every question available is urged on behalf of said minor, and in case of a failure to discharge this duty, it becomes the imperative duty of the court to see that the infant's rights are protected."

This expression appears in many cases from this court. Bolling et al. v. Campbell, 36 Okla. 671, 128 P. 1091; Griffin v. Galbraith, 114 Okla. 208, 247 P. 339, and

Tucker v. Leonard, 144 Okla. 264, 291 P. 124.

In Lowery v. Richards, 120 Okla. 261, 248 P. 622, in discussing the question, Did the guardian have authority to bind his ward by stipulation confessing judgment? the court cited section 280, C. O. S. 1921, now 213, O. S. 1931, which provides that the guardian of an infant shall deny, in his answer, all the material allegations of the petition prejudicial to such defendant, and then said:

"We cannot construe the law to be that, while a guardian must deny, in his answer, all the material allegations in plaintiff's petition, he may turn the cause for quieting title 'face about,' and by filing his petition on behalf of the ward, come in and confess judgment by stipulation, quieting title in defendant, and this court has never committed itself to such a construction. * * *

"In Bell v. Fitzpatrick, 53 Okla. 574, 157 P. 334, this court said:

" 'Neither can the guardian of said minor, by commencing an action and thereafter entering into a compromise and settlement of such litigation, by which same was dismissed, divest the title of said minor to said lands, nor confer any rights upon the grantee in such void conveyance, nor give any validity thereto, nor create an estoppel against said allottee, thereafter asserting the invalidity of such void conveyance.' See 31 C. J. 1143. * * *

"The interest of the ward must be as jealously guarded when he is plaintiff by guardian, as when he is defendant. * * *"

The opinion contains a quotation from the case of Pinchback, Adm'x, v. Graves et al., 42 Ark. 222. In the consideration of the instant case we find some expressions in this early Arkansas case most interesting:

"The business and juridical history of America is strewn with the wrecks of infants' fortunes. The courts and the relatives of infants are culpable in this, not the Legislature. The laws are wise and careful. The true spirit of them should be kept in view, and administered. * * * No judgment should be rendered affecting the interests of an infant until after defense by guardian, and this defense should not be a mere perfunctory and formal one, but real and earnest. He should put in issue, and require proof of, every material allegation of a complaint prejudicial to the infant, whether it be true or not. He is not required to verify the answer, and can make no concessions on his own knowledge. He must put and keep the plaintiff at arm's length."

The action of the guardian for the ward in this cause, as disclosed by the record, was in effect a confession of judgment against his ward in conformity with a compromise and settlement of said litigation with the defendant, and was a denial of the ward's right to a judicial determination of the issues raised by the pleading and was a fraud upon the court and upon the ward.

Fraud, extraneous of the record, by which the court was imposed upon in the proceeding, and by which the party complaining was prevented from having his interest fairly presented or fully considered by the court, vitiates a judgment and will authorize a court to vacate it. Southwestern Surety Ins. Co. v. Holt et al., 88 Okla. 281, 213 P. 80; McIntosh v. Holtgrave, 79 Okla. 63, 191 P. 739; Wray v. Howard, 79 Okla. 223, 192 P. 584, and Baldridge v. Smith, 76 Okla. 36, 184 P. 153.

In Lowery v. Richards et al., supra, the fifth paragraph of the syllabus reads as follows:

"A guardian of a minor cannot, by commencing an action on behalf of his ward, thereafter enter into a compromise and settlement of such litigation and confess judgment against his ward, quieting title to the ward's lands in the defendants or waive any of the substantial rights of the minor, and a judgment entered by confession by the guardian does not create an estoppel against the minor thereafter asserting the invalidity of such judgment."

As suggested above, the record discloses that no competent evidence was presented on March 8, 1920. A trial is defined by section 345, O. S. 1931, 12 Okla. St. Ann. sec. 551, to be a judicial examination of the issues, whether of

law or fact, in an action. Whether or not there was a trial within the above definition on March 8, 1920, upon the record before us and for the reasons above stated, we hold the judgment rendered in that proceeding, having been procured by fraud, to be invalid and without force against this plaintiff.

In addition to a determination in favor of the validity of the judgment of March 8, 1920, the trial court made findings in favor of the other defenses presented which make up issues in this appeal.

The findings of the trial court read in part as follows:

"I find that the census cards of the Dawes Commission correctly show the brother and sisters of Louis Harjo, but that the same erroneously show Judy instead of Lucy as the mother of Louis and that this is contradicted by the great weight of evidence adduced herein, which evidence I find to be clear and convincing, both from the oral testimony and the record testimony submitted."

A determination that plaintiff inherited a one-eighth interest in the Louis Harjo allotment, the same interest as found in the judgment of March 8, 1920, was based on the above finding.

Three relatives of the deceased Louis Harjo gave testimony.

Nellie White testified that Oche Harjo was her father; that he was also the father of Jimmy Harjo, Louis Harjo, Eplumke Harjo, and Chilley Ross; that her mother and Jimmy's mother was Judy; that the mother of Louis and Eplumke was Lucy; that Chilley Ross' mother was Togie; that Eplumke, Louis, and Jimmy are dead.

The documentary evidence introduced shows that in 1908 Nellie White and Eplumke signed a sworn statement that Louis Harjo's mother was Judy; that in 1910 Nellie White, joined by Jacob Harrison and Alex Walker, signed a sworn statement that Louis Harjo's mother was Lostage; that Nellie White was a half sister of Louis; that Jimmy Harjo and Chilley Ross were half brothers of Louis and that Eplumke was a full brother of Louis.

Chilley Ross testified that Togie was his mother; that Oche Harjo was his father, and also the father of Louis, Eplumke, Jimmy, and Nellie; that Lucy was the mother of Louis and Eplumke; that his mother died when he was eight years old; that at that time his father was living with Judy; that he never lived with his father or with any of the children of his father; that he thought he was 50 years of age.

The enrollment records indicate that he was born in 1884, and was younger than Louis.

The documentary evidence introduced shows that in 1915 Chilley Ross, joined by Jacob Harrison and Okarike Miller, signed sworn statements showing the family relationship as stated in Chilley Ross' oral testimony.

Eliza Thlocco, formerly Eliza Harjo, testified that the plaintiff, Edmond Harjo, is her son; that Jimmy Harjo was his father; that she knew Louis Harjo; that his father was Oche; that Judy Harjo said Louis was her son.

The documentary evidence introduced shows that in 1917 Eliza Harjo, joined by John Lolota and Isaac Jones, signed a sworn statement that Judy Harjo, the wife of Oche Harjo, had three children, and in the space provided in the instrument for the names of said children there appear the names, Jimmy Harjo and Nellie White. In her testimony on cross-examination Eliza Thlocco admitted the execution of an affidavit in 1926 stating that Lucy Harjo was the mother of Louis Harjo, and other matters concerning the relationships in the Harjo family.

In said cross-examination the following questions were asked and answer thereto given by the said Eliza Thlocco:

"Q. You did say in that affidavit that Eplumke Harjo and Louis Harjo were full brothers and had the same mother? A. Yes, I told it that way and I thought the law fixed it that way. Q. Do you now

contend that Lucy Harjo was the mother of Louis Harjo? A. Yes, sir, I am saying that everybody knows that. Q. Why did you say a few minutes ago that Judy was the mother of Louis Harjo? A. Well, I didn't know we was talking about that, I wasn't sure who it was. Q. In that affidavit you stated that after Lucy died Oche Harjo lived with Judy Harjo and that Oche Harjo and Judy Harjo had two children and that they were named Nellie and Jimmy, did you make that statement in your affidavit? A. Yes. Q. Is that statement true? A. Yes."

Jacob Harrison testified that he was 91 years of age; that he had held every official position in the Seminole Nation; that he knew the Harjo family; that Lucy was the mother of Louis; that Oche did not have a wife in 1874.

Isaac Jones testified that he had been a band officer in the Seminole Nation; that Lucy was the mother of Louis.

Isaac Jones joined Eliza Harjo in the execution of the written instrument of 1917, referred to above, wherein it was stated that Judy has three children; likewise he made affidavit in 1926 wherein he stated the statement of 1917 was incorrect and also that Lucy was the mother of Louis; this latter affidavit contained this statement: "After Lucy died, Oche Harjo lived with Judy Harjo and there was two children born of this marriage, Nellie and Jimmy."

The records of the Dawes Commission show, and it is undisputed, that Eplumke, the child of Lucy, was born prior to 1874, and that the children of Judy were born subsequent to 1874, and that Jimmy and Nellie were born before Louis.

Several other persons testified that Lucy was the mother of Louis. The record discloses that these persons were too young at the time Louis was born and at the time of Lucy's death to have had any personal knowledge concerning the parentage of Louis.

The records of the Dawes Commission contained the following descriptive matter with reference to four of the children of Oche Harjo: Eplumke, born 1871 of mother named Lucy; Jimmy, born 1875, of mother named Judy; Nellie, born 1878 of mother named Judy; Louis, born 1880 of mother named Judy.

This census card which shows that Judy was the mother of Louis Harjo was made during the lifetime of Oche Harjo and Judy Harjo by an impartial fact-finding body charged with the statutory duty of making a correct record. The testimony of these witnesses, not members of the Harjo family, that Lucy was the mother of Louis Harjo was given 53 years after the birth of Louis Harjo and was obviously hearsay, and the testimony of the relatives of Louis Harjo, who were in position to have personal knowledge, was in conflict with prior sworn statements made by them. We consider the evidence adduced herein to show that the census card was incorrect as weak and unconvincing and that the finding of the trial court that Lucy and not Judy was the mother of Louis Harjo is against the weight of the evidence.

In the absence of strong and convincing evidence to the contrary, the relationships of the Harjo family must be accepted as shown by the government records. Page v. Adkins, supra; Halsell v. Beartail, 107 Okla. 103, 227 P. 392, and Cox et al. v. Colbert, 135 Okla. 218, 275 P. 317.

The plaintiff contends that the finding of the trial court that Chilley Ross was a legitimate son of Oche Harjo and a lawful heir of Louis Harjo was against the weight of the evidence.

The census card of Chilley Ross shows Oche Harjo to be his father and Togie his mother. The parentage of Chilley Ross being thus established by this record, the presumption is that he is legitimate. McFarland v. Harned, 115 Okla. 291, 243 P. 141; Wright v. Tehee, 101 Okla. 136, 224 P. 163, and Locust v. Caruthers, 23 Okla. 373, 100 P. 520.

In Cox et al. v. Colbert, supra, this court said:

"The presumption that every child is the offspring of a lawful marriage, and that the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father, can only be rebutted by clear proof to the contrary. Orthwein v. Thomas (Ill.) 13 N. E. 564. See, also, Johnson v. Johnson, 30 Mo. 72; Strode v. Magowan, 65 Ky. (2 Bush) 621; In re Seabury, 1 App. Div. 231, 37 N. Y. Supp. 308. * * *

"The presumption in favor of marriage and the legitimacy of offspring is strengthened by lapse of time. In re Pickens' Estate, 163 Pa. St. 14, 29 Atl. 875."

The testimony offered to overcome the presumption of legitimacy is weak and unconvincing.

Under the record evidence presented, the weight of the evidence is in favor of the legitimacy of Chilley Ross.

Louis Harjo having died prior to statehood, the devolution of his allotment was governed by chapter 49 of Mansfield Digest of the Statutes of Arkansas. Heliker-Jarvis Seminole County v. Lincoln, 33 Okla. 425, 126 P. 723; Thorn v. Cone, 47 Okla. 781, 150 P. 701; Lasiter v. Ferguson, 79 Okla. 200, 192 P. 197.

The allotment being acquired through the blood of both parents, one-half became the property of the heirs of Oche Harjo, the father, and the other half went to Judy Harjo, the mother. Dailey v. Benn, 81 Okla. 285, 198 P. 323; Jarvis v. Goforth, 147 Okla. 168, 296 P. 477; Chastain v. Larney, 134 Okla. 127, 272 P. 471.

The predeceased father's one-half interest descended one-eighth to the heirs of Eplumke; one-eighth to Nellie; one-eighth to Chilley Ross and one-eighth to Jimmy, the father of plaintiff. Upon Jimmy's death in 1906, a one-eighth interest descended to plaintiff, subject to the dower interest of his mother, the surviving widow of Jimmy. Chapter 53, Mansfield Digest Stat. of Ark.

Judy, the mother of Louis Harjo, died in December, 1907, and the one-half interest in the allotment she had inherited from Louis descended one-fourth to Nellie, and one-fourth to this plaintiff, the sole heir of Jimmy.

In 1920 the plaintiff was seized with a three-eighths undivided interest in the lands involved in this controversy, one-eighth of which was subject to his mother's dower interest.

The trial court found that the plaintiff reached his majority on or before January 1, 1928, and that the three-year statute of limitation had run against the plaintiff after reaching his majority, and before filing his suit on July 28, 1931.

The plaintiff contends that this is an independent action in equity for relief on the ground of fraud, and that limitations upon actions of this kind do not begin to run against the right to maintain the same until after discovery of the fraud. In this we think the plaintiff is correct. Sections 556 and 563, O. S. 1931, and the cases cited by defendant in support of the trial court's determination relate to proceedings to reverse, vacate, or modify judgments or orders in the court in which they are rendered. A proceeding for such purpose, although based upon the ground of fraud in procuring the original judgment, must be commenced within two years from the date of such judgment, or upon an irregularity not fraudulent in obtaining the judgment within three years, or the proceeding will not lie. But that is not this case. This is an action to enjoin the enforcement of an adverse right upon the ground that it was fraudulently obtained, and we think it immaterial that the right obtained by fraud was a judgment. This is a civil action as contemplated by section 101, O. S. 1931, 12 Okla. St. Ann. sec. 95, which provides that an action for relief on the ground of fraud may be brought within two years after the discovery of the fraud. Plaintiff's verified petition alleged, and plaintiff's attorney testified, that the fraud complained of was not discovered until March 31, 1931. The action was commenced on July 28, 1931, and within the time provided in section 101, supra.

Defendants contend that no facts were proven excusing plaintiff's omission to avail himself, within the statutory time, of the statutory remedies for the correction or vacation of the judgment, and that his action could not be maintained under the rule as stated in Amos v. Johnston, 162 Okla. 115, 19 P. 2d 344, and other cases cited in defendants' brief.

The third paragraph of the syllabus in Amos v. Johnston is as follows:

"The remedies provided by statute to vacate or modify a judgment or order of a district court of this state are exclusive of relief by a direct suit in equity, unless there are reasons shown that the statutory law is inadequate."

The trial court made the following finding:

"I further find that the plaintiff and his representatives acquired and were in possession of all the facts alleged in plaintiff's petition in the year 1928, the exact or approximate date in said year not being at hand, but it must have been prior to May 12 of said year. The plaintiff did not testify in this case, and I cannot specify other than above when he first discovered the facts of fraud, and there is absolutely no evidence on the matter."

The record discloses that on August 5, 1927, the plaintiff filed a motion for new trial in cause No. 4155. The motion was overruled, and thereafter on May 12, 1928, plaintiff filed another motion for new trial, which the court struck from the files on the ground that it was identical with the motion that had been overruled.

The motion of May 12, 1928, was verified by the plaintiff and like the previous motion set forth certain grounds for vacation of the judgment. Upon an examination of the entire record it becomes apparent that the last-mentioned finding of the trial court herein is based upon the statements contained in plaintiff's verified motion of May 12, 1928. Said motion stated that plaintiff was a minor at the time of the rendition of judgment, that he had a right of appeal within six months from and after attaining his majority; that said right is still saved and preserved, provided he can make, serve, and file case-made or transcript in the Supreme Court, but that plaintiff is unable so to do, as he verily believes, for the reason that he has made diligent search and is unable to find any stenographic notes or transcript thereof of the testimony or proceedings had, and that if not granted a new trial, he will be denied his right of review by the Supreme Court. The motion complains of the judgment, "because said judgment is contrary to the evidence," and numerous other allegations of like import, but nowhere therein is there a suggestion that plaintiff at that time knew that said judgment was rendered without any competent evidence, upon statement of counsel as a means of effecting a compromise and settlement of his interest. On the contrary, the statements in said motion, verified by both plaintiff and his attorney, indicate that plaintiff on May 12, 1928, had no knowledge of fraud in the procurement of the judgment.

Plaintiff's attorney on May 12, 1928, also represented him at the time of filing this action on July 28, 1931. As hereinbefore mentioned, plaintiff's verified petition alleged, and one of plaintiff's attorneys testified, that the fraud complained of was not discovered until March 21, 1931, and there is no showing to the contrary. The judgment was entered in 1920, and plaintiff reached the age of 21 years more than two years prior to March, 1931. His right to proceed in cause No. 4155 to vacate the judgment on the ground of fraud, in the manner referred to in Amos v. Johnston, supra, was lost before the fraud was discovered. The remedy provided by section 556, supra, being unavailable through no fault of his own, the plaintiff is entitled to seek relief in the manner pursued herein.

It is contended that the order of the district court overruling plaintiff's motion filed on August 5, 1927, to vacate the former judgment, and its order striking from the files plaintiff's motion filed on May 12, 1928, are res judicata and constitute a bar to this action.

572

The decision of the court in denying the motions was final and res judicata only as to the questions put in issue by the motions and as to the questions which might have been put in issue. Brett v. Fielder, 136 Okla. 222, 277 P. 216. The motions did not raise the question of fraud as raised in this action, and said question could not have been put in issue, since the fraud had not then been discovered, as was pointed out in preceding paragraphs.

The trial court made a finding that the defendants holding conveyances from Willard Johnston are innocent purchasers for value and without notice as to infirmities of title of any kind, and these defendants here assert that whether the judgment is subject to attack against Willard Johnston or not, it cannot be set aside as against them.

The land was sold under the authority of a judgment not void on its face. These defendants were not parties to the proceedings, and if they had purchased at the judicial sale in reliance upon the judgment, they would unquestionably be protected under the rule as announced in Pettis v. Johnston, 78 Okla. 277, 190 P. 681. The rule as stated therein is as follows:

"The rights of bona fide purchasers of property sold under the authority of a judgment not void on its face, will not be affected or prejudiced by either the vacation of such judgment by the court rendering it, or a decree in equity annulling, evading, or restraining its further enforcement. * * *"

But these defendants purchased their interest in the land from the purchaser at the sale, who was a party to the proceedings, and who was charged with notice of the irregularities in the procurement of the judgment. Under these facts it must be determined if these defendants were bona fide purchasers.

The briefs cite several cases based on the rule "that if a second purchaser for value and without notice purchases from a first purchaser who is charged with notice, he thereby becomes a bona fide purchaser and is entitled to protection." See Pomeroy's Equity Jurisprudence (4th Ed.) sec. 754. The rule is stated in paragraph 2 of the syllabus in Tootle v. Payne, 82 Okla. 178, 199 P. 201, and the principle followed in numerous cases from this court. Vose v. Penny, 78 Okla. 238, 190 P. 97; Brooks v. Tucker, 83 Okla. 255, 201 P. 643; Atkinson v. King, 93 Okla. 37, 219 P. 914; Illinois Valley Trust Co. v. Sells, 167 Okla. 58, 27 P. 2d 1046.

In none of the above cases was the original purchaser a party to the litigation, as the sales were in guardianship proceedings. There is a material difference in a situation where the above rule would be applicable and the facts in this case. In the above cases, although the first purchaser was not an innocent purchaser, there was nothing on the face of the record to apprise the second purchaser of that fact. Here the judgment itself reveals that the purchaser at the sale was not an innocent purchaser. The judgment reveals that said purchaser was a party to the action.

It is well settled that a purchaser at a judicial sale who is not a party to the proceedings is not bound to look beyond the judgment. Pettis v. Johnston, supra. If the judgment was procured by fraud, but is regular and valid on its face, such purchaser cannot be charged with notice of irregularities in the procurement of the judgment except by proof that said purchaser had knowledge of such irregularities at the time of the purchase, but if the purchaser at the judicial sale is a party to the proceedings, a knowledge of the irregularities in the procurement of the judgment is imported to him because of the position he occupied in the action. The face of the record, which reveals that he was a party, establishes the fact that he is not an innocent purchaser.

In Pettis v. Johnston, supra, it is said:

"Whether or not the plaintiff had any notice or knowledge of the falsity of the return of service, he can never occupy the position of bona fide purchaser under a judicial sale in a proceeding instituted by him. Arnold v. Joines, 50 Okla.

4, 150 P. 130; Hubbard v. Ogden, 22 Kan. 671."

Well-considered authorities point out that there need be no difference made in every case between reversal of a judgment and the proper and timely vacation of a judgment. See annotations commending in 29 A.L.R. at page 1078.

The right of an infant, or one upon attaining legal age, to attack a judgment rendered against him during his minority is universally recognized by statute and court decisions. Where, after attaining majority, a party properly shows himself entitled to the vacation of a decree, for fraud in the procuring thereof, which by such fraud was obtained against him during his minority, then equity should be most reluctant to perpetuate the result of such fraud on the minor, by a finding that the so-called innocent purchaser rule should protect purchasers from one who was a party to the original action, and who purchased through or under the wrongful judgment against the minor. The subsequent timely vacation of the judgment puts an end to the title purchased by a party thereunder. That defeasible quality of the title purchased by Willard Johnston was engrafted upon his title by operation of law, under the circumstances of this case, of which ignorance cannot be claimed by those who subsequently dealt with him.

The rule stated in 29 A.L.R. 1078 appears to be uniform. No citations expressing a minority rule appear in the annotation. It is said, "if the judgment creditor or any other party to the record purchases at the execution sale, a reversal or vacation of the judgment puts an end to his title."

Here we have a party to the litigation involving a minor's estate who purchased at the sale held under a decree thereafter justly vacated for fraud in its procurement. His title is ended under the rule.

What, then, is the proper rule applicable to the vendee of such party litigant who purchased at the sale? It is said in 29 A.L.R. 1084:

"It has been held that in a majority of the jurisdictions passing on this point, that one who purchases property from a party to the record, who acquired the property at his own execution sale, loses his title by a reversal of the judgment."

True, nearly all cases cited supporting this rule are pendente lite cases. Such cases must frequently occur, but no distinction is made against the class of cases or those cases which are within the classification of vacated judgments; and especially is this true under the rule applied in Illinois as disclosed by Denk v. Fiel, 94 N. E. 672, limiting the rule in its application to minor's estate. Such rule is peculiarly applicable in the case at bar. We think certain portions of the opinion in Denk v. Fiel are particularly forceful and applicable here. There in part it was said:

"The right of an infant to maintain an original bill for relief against a decree entered against him during his minority for fraud or for error appearing upon the face of the proceedings is settled by a long line of authorities in this state. * * * (citing cases) * * * The above authorities settle beyond controversy the jurisdiction of equity to entertain an original bill at the instance of minors whose rights have been prejudiced by a decree rendered against them while they were under lawful age, and that such bill may be filed during minority or within the time fixed by the statute for suing out a writ of error after such infant defendants have attained their majority. * * * (and citing other cases) * * * When these cases are considered in connection with the line of cases which hold that a bill of this character can be maintained for the purpose of impeaching a decree against a minor for fraud or for error apparent on the face of the proceedings, there appears to be an inconsistency between the two rules announced. A decree or judgment rendered in a proceeding wherein jurisdiction of the court is wanting is absolutely void and may be called in question at any time by any person affected thereby, either directly or collaterally. If it is this class of decrees only that can be impeached by a bill of this kind, then there is no reason for limiting its use to infants against whom such decree has

been entered. Such remedy would be equally available to adults in so far as it applies to void decrees and judgments. Equity in extending this remedy to a class of persons whose rights have always been the subject of the tender solicitude of a court of chancery intended to confer upon such class a substantial remedy for the redress of grievances which was not open to the unrestricted use of litigants generally. The right thus intended to be accorded to persons coming within the class for whose benefit the remedy is provided is the right to file an original bill to impeach and set aside a judgment or decree for fraud or error which appears upon the face of the proceedings in all cases where the rights of innocent third parties will not be affected. When the subject-matter of the original decree is in the hands of persons who were parties or in privity with the parties to the original proceeding, a bill may be filed by infants for the purpose of setting aside such decree or judgment for fraud or for any error which appears upon the face of the record for which such decree or judgment would be reversed by a court of review. The reason for this distinction is that the party to a suit is presumed to know of all the errors in the record, and cannot acquire any rights or interests based on such erroneous decree that will not be abrogated by a subsequent reversal or annulment of such decree. All titles acquired by parties to an erroneous record are held subject to be divested when such erroneous judgment is reversed or set aside. McJilton v. Love, 13 Ill. 486, 54 Am. Dec. 449; Chickering v. Failes, 29 Ill. 294; Cable v. Ellis, 120 Ill. 136, 11 N. E. 188; Aurora & Geneva Railway Co. v. Harvey, 178 Ill. 477, 53 N. E. 331; Ure v. Ure, supra; Freeman on Judgments, § 4, p. 81."

Therefore, considering the record before us, we find a minor's estate involved at the time of the judgment, such subject matter calling for "the tender solicitude of the court." As we view it, in such case, the protection of the law follows, in the interest of minors' estates, and restores the land thus sold in violation of the fundamental rights, notwithstanding that title may be found to rest in one who has purchased from a party litigant, or his grantee, who was the original purchaser at the sale of the minor's land.

Willard Johnston having purchased the lands at the judicial sale, the judgment or decree was shown on the face of the title papers as an indispensable element of the title of these defendants. And when it was shown, these defendants, vendees of Willard Johnston, were bound to take notice that Willard Johnston was not a bona fide purchaser and of the defeasible quality of the title.

This court is committed to the doctrine that an invalid judgment is not void in a legal sense unless its invalidity appears on the face of the record; that in a legal sense it is merely voidable; Pettis v. Johnston, supra; Edwards v. Smith, 42 Okla. 544, 142 P. 302. It follows that Willard Johnston, the purchaser at the judicial sale under a judgment valid on its face, became the purchaser of the full legal title. These subsequent purchasers from Willard Johnston likewise became purchasers of the legal title, and in reliance upon the judgment, but the judgment on its face reflected its voidability as against Willard Johnston; and it is a familiar principle of equity that one who acquires a title with notice of a prior equity takes it subject to that equity. Arnold v. Joines, 50 Okla. 4, 150 P. 130.

The defendants contend that plaintiff was estopped by his receipt and retention of his portion of the proceeds of the partition sale from attacking the judgment, and further that he is barred by laches from maintaining this action.

The general rule with reference to estoppel is stated in the second paragraph of the syllabus in Southwestern Surety Ins. Co. v. Holt et al., 88 Okla. 281, 213 P. 80, as follows:

"The general rule is that a ward on arriving at full age ratifies his guardian's unauthorized acts by receiving and appropriating the proceeds and benefits thereof to his own use, but in order to create an estoppel by the acceptance of benefits, it is essential that the party against whom the estoppel is claimed should have acted with knowledge of his rights; also that the party claiming the estoppel was without knowledge of the

facts on which he bases his claim of estoppel, that he was influenced by and relied on the conduct of the person sought to be estopped, and that he changed his position in reliance thereon to his injury."

In Kirkpatrick v. Baker et al., 135 Okla. 142, 276 P. 193, the fourth paragraph of the syllabus reads:

"The question of whether a claim is barred by laches must be determined by the facts and circumstances in each case and according to right and justice. 'Laches' legal significance is not mere delay, but a delay that works a disadvantage to another."

As hereinbefore mentioned, the record discloses that the plaintiff began his action very promptly after discovering the fraud in the procurement of the judgment. The discovery was made on March 21, 1931, and suit was filed July 28, 1931.

The record further discloses that the defendants began their developments of the land and made a large part of their expenditures during plaintiff's minority. Under the facts in this case, from the time the plaintiff could have asserted his claim until he began this action there was not such a delay as to work a disadvantage to the defendants.

The development of the lands began during the minority of the plaintiff, and there is no evidence that the defendants were influenced by or relied upon the conduct of the plaintiff in the retention of the proceeds of the sale or that the defendants changed their positions by reason thereof. The tender of the amount received from the sale by the plaintiff would not affect the substantial rights of the defendants, except as to such benefit they might derive by the tender. The burden is upon the defendants to prove facts to create an estoppel. The facts in this case, when applied to the above-quoted rule, do not create an estoppel. In equity and good conscience, however, the plaintiff should not retain the proceeds he received from the sale upon the vacation of the judgment and the avoidance of the sale.

This court has repeatedly held that in a case of equitable cognizance, where the judgment of the trial court is against the clear weight of the evidence or contrary to the law applicable thereto, this court will reverse such judgment or decree, and render or cause to be rendered such judgment and decree as the trial court should have rendered. Elliott et al. v. Englebrecht et ux., 181 Okla. 41, 72 P. 2d 352; Long v. Anderson, 77 Okla. 95, 186 P. 944; Richard v. Richard, 172 Okla. 397, 45 P. 2d 101; Koutsky v. Park National Bank, 167 Okla. 373, 29 P. 2d 962.

Upon a review of the facts in this case and the law applicable thereto, and for the reasons stated in the foregoing discussion, the judgment of the trial court is reversed and the cause is remanded, with directions to enter judgment for the plaintiff decreeing the judgment of March 8, 1920, to be void and of no effect, and upon condition that the plaintiff deposit with the court clerk of Seminole county for the use and benefit of the defendants a sum of money equal to the amount paid to the guardian of the plaintiff from the proceeds of the sale had under said void judgment, together with interest thereon at 6 per cent. from the date the same was paid out, the trial court is directed to enjoin the defendants from asserting any rights or interests under or by virtue of said void judgment or under or by virtue of any subsequent order, judgment, or decree based upon said void judgment, and the trial court is further directed to enter judgment for the plaintiff decreeing said plaintiff's inheritable interest in the land allotted to Louis Harjo to be an undivided three-eighths interest subject to the dower interest above mentioned.

The record here is silent as to the rents, profits, and benefits derived from the use and possession of the above-mentioned undivided portion of the lands involved, since March 8, 1920, and all questions as to accounting or the equitable division thereof is reserved to the future determination of the parties or of a proper court.

576

RILEY, CORN, GIBSON, and DANNER, JJ., concur. BAYLESS, C. J., and OSBORN, HURST, and DAVISON, JJ., dissent.

___

BAYLESS, C. J. (dissenting). I dissent to the opinion of the court as expressed by the majority. I believe there are two fundamental errors underlying the court's opinion. One involves an erroneous weighing of the evidence, and the other an erroneous application of well-known and easily understood rules of law. I believe that a summarized statement of the positions of the parties will tend to throw much light upon the fraud that the court thinks was perpetrated upon the minor, and will also tend to emphasize the errors committed by the views expressed by the majority.

The whole tenor of the court's opinion would lead one who had not given careful scrutiny to the record to suppose that the asserted fraud was initiated against a minor and the judgment resulted from an active preconceived arrangement to compromise acknowledged claims. This is not the case. It should be borne in mind that the minor was the plaintiff in the former action, and was the moving party seeking to establish an interest in the property by inheritance as an heir of the deceased allottee, and the record discloses that Johnston strenuously denied that he was an heir or had any interest in the land. Johnston was not the moving party, he was the party moved against. I find no basis in the record for the majority's statement that the journal entry of judgment was agreed upon and signed by the attorneys for the parties prior to the date of the hearing, March 8, 1920.

The opinion would lead one not familiar with the record to suppose that some of the minor's opponents prevented him from presenting to the trial judge the information contained in the records kept by the United States at the Indian Agency. This is not the case. The minor himself refused to rely upon those records, and it was his attorney who failed to call them to the attention of the trial judge. As pointed out in Page v. Atkins, 86 Okla. 290, 208 P. 807:

"The information furnished on this card, such as age, sex, and parentage of the citizen (the very point at issue in our case) is descriptive matter, and there may appear an error as to one or more of those descriptive words. * * *" (My parenthesis.)

The reason the minor did not wish to rely upon these records is stated by his former attorneys to be that the descriptive matter contained in those records was susceptible of being so completely contradicted by the testimony of many living witnesses that they felt they could do better by using other types of evidence. Their opinion in this respect is amply borne out by the record in this case. The defendant, Johnston, nor anyone representing him, prevented the minor presenting this evidence. Johnston should not now be charged with fraud upon the minor for mere errors of judgment on the part of the minor's guardian ad litem and attorneys. It must be borne in mind that the contested issue was one of parentage, and hearsay evidence was admissible. The attorneys representing the minor had instituted the suit for him and had made extensive investigations of his parentage; and their testimony was substantially the same as that given by many of the defendant's witnesses at the subsequent trial to the effect that plaintiff was entitled to only an undivided ⅛th interest in the land.

The conclusion of the majority opinion would also lead one not informed upon the subject to suppose that if the trial judge had been possessed of the information contained in those records he would have rendered a different judgment on March 8, 1920. This is not the case. The eminent trial judge in this action knew their full contents, and although they were strenuously urged upon him, he chose rather to follow the word of mouth testimony of the aged members of the tribe. These unwarranted suppositions clothe the court's opinion with an air of the necessity of coming to the rescue of a minor who has been

fraudulently proceeded against, when nothing is further from the truth.

The first error is the court's finding that no evidence was given at the hearing on March 8, 1920. This finding is directly in the face of positive and uncontradicted evidence. In short there is no evidence to support it.

The majority has taken certain statements of those who were present at the trial concerning the informalities of procedure and has characterized them as proof of an agreement to compromise the minor's claims, holding, in fact, that a stipulation was made when none existed. This is unwarranted. Up to the day of the trial Johnston was a willing antagonist, but a helpless one. He had no evidence to refute the minor's claim of heirship and inheritance. From the evidence which I am shortly to quote, it clearly appears that Johnston only professed himself unable to refute the minor's proof, he did not stipulate or compromise. To say that an adult defendant who announces to the trial court, at the conclusion of the minor plaintiff's case, that he is without evidence to refute what has been shown and claimed, is thereby a stipulation with the minor upon the facts, and is thereby a perpetration of a fraud upon the minor, is unjustified. It seems to me unjust to say to an adult who is sued by a minor: You must plead a defense whether you have one or not; you must introduce evidence to contradict what the minor has shown, whether you have such evidence or not; and that you must never cease for one moment to contest with the minor, perhaps even to appealing from the judgment irrespective of its effect, or you perpetrate a fraud upon him. It is admitted that the defendant may not aid or advise in the preparation and prosecution of the minor's case, for that would be collusion; but the inference left is that he must resist it to the point of being inconsistent, and even illogical and ridiculous (as presenting evidence one does not possess), or he actively perpetrates an actual fraud upon the minor. I do not mean to imply that the majority would consciously reach such an unsound opinion, but their confused notion of the evidence has led them to this result unconsciously.

I desire at this point to set out the testimony of the lawyers who appeared at the trial on March 8, 1920, representing both sides. Naturally the lapse of many years has somewhat dimmed their recollection, and they have carefully refrained from giving an appearance otherwise. But the following evidence, which is the only evidence in the record upon the subject, clearly demonstrates the error in the court's opinion.

J. Read Moore was one of the attorneys for the minor in the action tried in 1920. His testimony in this case is that he had spent several years compiling what he considered an accurate record of the pedigrees of the various Seminole Indians and that his compilation was based upon the enrollment records of the United States, and the statements of the living members of the tribe. He stated that the enrollment records (as is recognized in Page v. Atkins, supra) were inaccurate in many particulars, and that he considered them inaccurate with respect to the pedigree of this minor. From the information which he obtained from the enrollment records and the testimony of members of the tribe, he prepared a chart of the family tree of the minor, and it was this chart which was introduced in evidence and considered by Judge Johnson in 1920, and it is in evidence in this case. Therefore, it is not correct to say, or to give rise to the inference, that the trial judge was kept in ignorance of the enrollment records on March 8, 1920.

John W. Wilmot, a law partner of J. Read Moore, and the attorney who actually presented the minor's case on March 8, 1920, testified as follows:

"Q. Now, I will ask you to state to the court, when the matter came up for hearing March 8, 1920, what proceedings took place? A. From the fact I signed Mr. Moore's name to the journal entry, I believe Mr. Moore may not have been pres-

ent on that occasion, I also seem to have a dim recollection of Mr. Moore's not being there, I remember Mark Goode being there. It is my practice in cases of that kind, where we were not going into any contest over what the facts were, it was my practice to ask the court to swear me and then state the facts of the case which would justify our right of recovery, or the court may ask me questions he cared to ask in regard to them. Q. Mr. Wilmot, did you indicate to the court also that you had the witnesses present who would testify to those facts? A. I can't recall that. Q. Do you have any recollection, hazy or any way, by which you can answer my question? A. I think after I laid out the facts to Judge Hal Johnson he turned to Mark Goode and asked him and he told him his investigation, it revealed those were the true facts. Q. To the best of your remembrance, did you make a statement of the truth? A. That was my custom, I can't recall. Q. And in reply to that, Mark Goode stated to the court he couldn't refute your statement in regard to it? A. Yes, sir."

Mark Goode, attorney for Johnston, testified as follows:

"Q. Go ahead and state what took place? A. I got down there and went by myself, I went on the train, I don't remember the hour I got there, but I believe was close about 12 o'clock. I immediately located Mr. Moore and told him we was not in a position to contest their claims, we couldn't produce more than they had and I would be perfectly willing for them to put on evidence and take judgment, I then learned that Johnston was there, I said that don't make any difference—By the Court: You are talking about Judge— A. Yes, sir, Hal Johnson, and we was around at the courthouse and went upstairs and went up to the courthouse and John Wilmot was on the floor, and they were local attorneys and I went up and stopped Wilmot and told him I was ready for him to take judgment, and we had been threatening them about three years, and he made a statement to the court that we were from out of town and didn't believe there would be any contest and the court wanted to know what it was about, said he would dispose of it if he could and Wilmot, I think, I brought into him from Moore's files most of the things I had taken back to Johnson, and he got up before the court and told him the story.

Q. Do you recall whether or not Mr. Wilmot was sworn at that time? A. I think he was, but he made a statement and tendered the witness, said they had them and the court made the indication that he didn't think it was necessary and I think Wilmot said, 'Well, Your Honor, I think I had better be sworn,' and *introduced documentary evidence, that chart,* and I think John Wilmot was sworn and these introduced, and they said certain things were the facts and went over the family tree at length and when he got through the court asked me what I had to say, and I said I ain't got nothing to say."

Thus it can be seen that the minor plaintiff had ample opportunity to show to the trial judge the things upon which he relied for his relief, and the defendant's part of the proceedings were entirely negative. The majority opinion holds that the finding of the trial court to the effect that the plaintiff was entitled to only ⅛th of the land was against the clear weight of the evidence. From an examination of the record, I am of the opinion the trial court was justified in making the finding he did. At least, I am unable to say his finding was against the clear weight of the evidence, because almost every witness testifying for the plaintiff at some time or another had given conflicting evidence concerning the plaintiff's parentage, which testimony contradicted the enrollment record.

All of this follows a finding on the part of the court that if those representing the minor at that time had chosen to use the records of the Indian Agency as their only evidence, the minor would have been adjudged to have a larger share in the estate. But this view fails to take into consideration the fact that the trial judge might not have taken that evidence in preference to the testimony of upwards of ten or more living witnesses contradicting the information contained in those records. Even the minor himself, represented by his guardian and attorneys, was unwilling to rely upon those records for fear of successful contradiction by the living witnesses. Subsequently, when the action from

which this appeal is taken was tried, the learned trial judge found contrary to the records, and based his judgment upon the testimony of living witnesses.

The second error relates to the misapplication of well-recognized rules of law. In Sawyer v. Ware, 36 Okla. 139, 128 P. 273, and the cases since, we have pointed out the difference in the position of a minor who attacks a judgment against him by one of the methods especially provided for him by our statutes. Some of the errors that would entitle him to relief can only be taken advantage of by way of appeal within six months (see Pfister v. Johnson, 173 Okla. 541, 49 P. 2d 174). Others that fail to disclose the infancy or the alleged errors on the face of the record must be taken advantage of under the provisions of section 556, O. S. 1931, 12 Okla. St. Ann. sec. 1031. And still others may be remedied under section 431, O. S. 1931, 12 Okla. St. Ann. sec. 700. By those methods a minor may successfully attack judgments or orders against him without respect to intrinsic or extrinsic fraud; for the law continues the life of the action out of which the error arises for a specified period of time beyond the attainment of majority by the minor, and they constitute a direct attack upon those judgments or orders in a method provided by law in the same action wherein the error occurred.

The court has characterized matters which clearly constitute a ground of direct attack under two of those methods as being extrinsic fraud without the slightest basis therefor in the decisions of this court or those of any other jurisdiction. In all of the cases cited in the majority opinion, the attack was within the period allowed to a minor to attack a judgment or order after attaining majority. There are other decisions of this court upon the same point, not cited in the majority opinion, but they are all of the same type, and do not involve extrinsic fraud.

I have no fault to find with those decisions wherein it has been held that an action clearly compromising a minor's claims constitutes legal fraud upon the minor. They represent a rule adopted by this court and long adhered to. But it is so clear that the legal fraud thereby assumed to exist to protect a minor's fraud that arises by virtue of the policy expressed in the statutes above referred to that create special privileges for a minor to exercise within a limited period after attaining majority, and inheres in the very issues heard and tried. The compromise adjustment of a minor's claim obviously inheres in the very proceedings that are presented to the trial judge and adjudged by him (albeit in conformity with the compromise). These are matters that would be intrinsic fraud even as to the minor were it not for the saving grace of the statutes referred to. In Thomas v. Monroe, 179 Okla. 416, 65 P. 2d 1008, we held such legal fraud renders the judgment voidable and not void.

It is significant that the minor partly availed himself of the statutory remedies provided for him. It is not certain from this record when he attained his majority. The trial judge found that he attained his majority "on or before January 1, 1928." August 5, 1927, Edmond Harjo, in his own name and not by a guardian, filed a motion for new trial that does not include the word "fraud" but which contains many allegations that could be easily so construed; and he explicitly asserted that the judgment of March 8, 1920, was not supported by sufficient legal evidence, and that he now has evidence that was not offered at the earlier trial that would show he was entitled to a greater interest than was awarded him. September 9, 1927, this motion for new trial was overruled, but he made no effort to appeal and save the rights he claimed. See Pfister v. Johnson, supra. Thereafter, on May 12, 1928, he filed a second motion for new trial, wherein he alleged that he was now an adult, and six months had not expired since attaining his majority. He reiterated many of the allegations of the former motion, and expressly asserted that he was prevented from having a fair and impartial trial on March 8, 1920 (the

thing the majority now finds to be a fact). This motion was denied on the ground that it covered grounds theretofore advanced and denied by the order of September 19, 1927. He made no effort to appeal.

This appeal is from an independent action in equity brought several years after his disability ceased, and is brought under the third subdivision of section 101, O. S. 1921, 12 Okla. St. Ann. sec. 95, a section of our statutes relating to causes of action generally and without any regard to the special privileges elsewhere created for minors. Anyone who has suffered the rendition of a judgment against him by the fraud of his adversary may, within two years after discovering the fraud, seek relief against it. This is precisely the issue relied upon herein by the plaintiff, but the majority has so commingled it with the special privileges created elsewhere for minors that it bears no reasonable resemblance to the cause of action initiated.

The fraud spoken of in the preceding paragraph as the basis for relief under the section cited, is extrinsic fraud and never intrinsic fraud. This rule is so well known that it is needless to cite our decisions, which may be found under the subject, Judgments, Key No. 440-443 Okla. Dig. (West). It is sufficient for my purposes to outline the elements of each type of fraud, and the contrast between them clearly establishes the failure to apply the true rule in this case.

Extrinsic fraud consists of (1) falsely inducing the court to assume jurisdiction; (2) keeping the party or his attorney from attending the trial by deceit; (3) deceiving the opponent whereby he is prevented or restrained from presenting his claim; (4) taking a judgment in violation of an agreement compromising the claims; and (5) corrupt conduct on the part of one's attorney to his prejudice.

Intrinsic fraud consists of (1) false or prejudiced testimony respecting the issues tried; (2) misconduct reflecting upon some issue tried by the court; and (3) unfair and prejudicial conduct in the trial of the action whereby the opponent is prevented from having a fair trial.

To say that when the adversary of a minor rises in open court and advises the trial judge that he is unable to produce any evidence to refute the claim of the minor, he thereby perpetrates a fraud upon the minor that necessitates a setting aside of the judgment rendered in favor of the minor, is untenable. In other words, we say to a party who is being sued by a minor: You must defend, you must introduce evidence, you must resist, perhaps even by appealing, or you perpetrate a fraud upon the minor. Briefly, it is a fraud upon a minor not to possess a defense to his asserted claim.

The only purpose for the existence of courts is well expressed in the phrase, due process of law. The adjustment of conflicting claims of adversaries according to the dictates of due process of law exhausts both the need for and the duty of the courts. In the pursuit of this purpose and task, courts are aided by legislation in those instances wherein the people have chosen to legislate and by their own reasoning and experience and learning, wherein the reasoning, experience, and learning of other courts is consulted. It results from this that legislative or judicial policy oftentimes dictates the adoption of rather arbitrary rules, and some of the best known of these are limitations of actions, res judicata—the end to litigation over an issue once tried, and the repose of titles. The last may well be encompassed within the first two, but such classification as I have set out does no violence to reason or logic and lends strength to the point I am trying to make. The fundamental reason for the rule of res judicata is based upon stability and reliance in judgments, yet here is an example of the violation of the rule which to my mind opens the door to unlimited litigation.

The opinion written by the majority destroys any reliance that ought to be indulged a judgment wherein a minor

was involved. Titles to property depending upon the validity of a judgment against a minor are generally regarded as subject to being attacked within 12 months, at most, after majority is attained (see Wagner v. Ware, supra), and it is supposed that mere errors that would justify a reversal on direct appeal are sufficient to render the judgment vulnerable. But, as pointed out in National Exp. Co. v. Robins, 140 Okla. 260, 283 P. 236:

"Plaintiff in the instant case was over 23 years of age at the time the suit was filed. Had he instituted this proceeding within one year after arriving at the age of majority, relief, no doubt, would have been granted him under section 684, C. O. S. 1921."

This statement of ours is in keeping with the general rule. See 14 R.C.L. 296, sec. 62, note 12; and Kemp v. Cook, 18 Md. 130, 79 Am. Dec. 691; Eisenmenger v. Murphy, 42 Minn. 84, 43 N. W. 784, 18 A.S.R. 493; and Robertson v. Blair, 56 S. C. 96, 34 S. E. 11, 76 A.S.R. 543. See, also, Mayo v. Clancy, 57 Miss. 674; Leavell et al. v. Carter, 112 (Ky.) S. W. 1118; In re Tilden's Ex'rs, 98 N. Y. 434; and Adams v. Belt, 136 Miss. 511, 100 So. 191.

If the rule announced for the court by the majority is to prevail, there is no such thing in Oklahoma as unconditional title, if the title is at any period of its existence dependent upon a judgment adjudicating the. interests of a minor. Under the majority rule, there is no age in life at which a person whose rights in certain property were adjudicated during his minority may not begin to search for irregularities in those proceedings, and predicate an action thereon within two years after discovery. Especially is this to his advantage when many years have elapsed since the rendition of the judgment and the witnesses as well as attorneys and other parties who might be familiar with the facts have forgotten the true facts occurring at the trial. It seems that because he was a minor he is the special ward of this court so long as he remains alive.

I cannot believe there is any policy of the law or of society with respect to the rights of former minors that justifies such a rule of law.

OSBORN, HURST, and DAVISON, JJ., concur.

———

OSBORN, J. (dissenting). While I concur in the dissenting views presented by Chief Justice, and in my opinion there are additional legal bars to plaintiff's recovery in this case, this dissent is addressed to the conclusion of the majority opinion that the immediate and remote vendees of defendant Johnston are not entitled to protection as bona fide purchasers. The rule announced is contained in syllabus 10, and is as follows:

"When a judgment or decree divests minors of title to land, and such subject matter of the decree remains in the hands of persons who were parties, or in privity with the parties, to the original proceedings, an action will lie by persons, who were minors at the time, to set aside such decree or judgment, for fraud in the procurement thereof, and the vendee of a purchaser who was a party litigant at a sale of a minor's interest in land will not be protected as an innocent purchaser."

It is my view that the majority opinion will vitally affect thousands of titles within this state, since many titles are dependent upon mortgage foreclosure proceedings, partition suits, and suits to quiet title where judicial sales are involved and where parties litigant are the purchasers at such sales, and therefore the rule so announced is of far-reaching importance. I have attempted to give careful consideration to the contentions of all the parties herein, and at the conclusion of my study and research I find myself unable to agree with my associates, and due to the importance of the question, I deem it proper to publish my views.

Plaintiff herein was born on February 9, 1906. This action was instituted on July 28, 1931, more than four years after he attained his majority.

We have often announced the essential elements which constitute a bona fide purchase. These are: (1) a valuable consideration; (2) the absence of notice; and (3) the presence of good faith. Brooks v. Tucker, 83 Okla. 255, 201 P. 643; Berry v. Tolleson, 68 Okla. 158, 172 P. 630; Atkinson v. King, 93 Okla. 37, 219 P. 914. No contention is made that the transfers from defendant Johnston to the various vendees were made without a valid consideration or that there was absent any degree of good faith. Such vendees, therefore, are denied the right to protection as bona fide purchasers because they are charged with notice of any fraud perpetrated or participated in by the purchaser at the sale who was a party to the suit.

The majority opinion concedes the rule to be in this jurisdiction "that if a second purchaser for value and without notice purchases from a first purchaser who is charged with notice, he thereby becomes a bona fide purchaser and is entitled to protection." The principle of protection to bona fide purchasers is firmly imbedded in our jurisprudence, and in addition is a part of the legislative policy of this state. See 12 Okla. St. Ann. § 774, and 12 Okla. St. Ann. § 176. The majority opinion is predicated upon the case of Arnold v. Joines, 50 Okla. 4, 150 P. 130. In that case, as well as in the case of Morgan v. City of Ardmore, 182 Okla. 542, 78 P. 2d 785, it was held that the grantee of a judgment creditor who purchased land at a sheriff's sale was not entitled to protection as a bona fide purchaser. Those cases are predicated upon the proposition that the judgment was absolutely void and that the invalidity was shown upon the face of the judgment roll, whereas in the instant case it is conceded that there is nothing upon the face of the judgment or the judgment roll which would disclose the alleged fraud or would operate as notice to any vendee of defendant of the invalidity of the judgment relied upon. These authorities, therefore, in my opinion, have no relation to the proposition now before the court. I have examined the various authorities relied upon by plaintiff to establish the position of my associates in the majority opinion and find that they involve either a void judgment, a purchase pendente lite, a failure to pay value, or actual knowledge of the fraud perpetrated upon the complaining party. I have been cited to no case which, in my judgment, supports the majority view in this respect.

An analysis of that portion of the opinion dealing with the rights of the vendees of defendant Johnston discloses that said vendees are held to be chargeable with notice (1) of the defeasible quality of his title and (2) of notice of an outstanding equity. In order to arrive at such conclusion it is necessary to indulge in certain presumptions, the first presumption being that Johnston's title was in fact defeasible and that he in fact took the same subject to an outstanding equity. Said presumptions are held to arise on the sole ground that the record discloses that Johnston was a party litigant.

I concede the principle to be well established that a party litigant who purchases at a judicial sale is not entitled to claim protection as a bona fide purchaser for the obvious reason that, as a party to such proceeding, he is chargeable with notice. Such fact, however, does not militate against his right to purchase. He has the same right to purchase as any other party. The majority opinion holds that if he exercises such right, his vendees are burdened with the presumption that his title is defeasible, even though such presumption may be, and in most cases is, contrary to the true facts. Such vendees also carry the burden of a presumption that such purchaser took only a legal title subject to a prior equity, which presumption likewise is most generally contrary to the true facts. I cannot concur in this logic.

I am not in accord with the view that "there need be no difference made in every case between reversal of a judgment and the proper and timely vacation

of a judgment." It might be inferred that the judgments alluded to are judgments against minors, but the language is not so limited. I cannot conceive of a statement more subversive to the established principles of collateral attack. In support of the view the majority opinion refers to annotations appearing in 29 A.L.R. 1078, 1084. The first deals with purchasers by judgment creditors at execution sales. The second relates to purchases pendente lite. Considerable emphasis is placed upon the case of Denk v. Fiel, 249 Ill. 424, 94 N. E. 672. Portions of the opinion of the court in that case are quoted in the majority opinion. An examination of that case discloses, however, that the discussion related to a purchase pendente lite. The court was discussing the rights of one who had purchased pending the equitable proceeding to set aside a former conveyance executed during the minority of the complainants. We quote the following language therefrom:

"At the time the bill in this case was filed the title to the real estate involved was in the widow, Anna Fiel, and her husband, Frank Fiel. While Frank Fiel was not a party to the original proceeding, he does not occupy the position of an innocent purchaser for value without notice. In fact, his relation to the property is the result of his having paid off an indebtedness against it which was secured by a trust deed. He might have some right, by way of subrogation or otherwise, to reimbursement for whatever amount he has paid to relieve the property of liens. After the bill in the case at bar was filed, Anna Fiel and her husband conveyed the property in question to James M. McManus for an express consideration of $5,400. *McManus, having purchased the property after the commencement of this suit,* holds his title subject to any interest that may ultimately be established in the parties as the result of this litigation. Under the rules announced, the rights of the parties are to be determined in the same manner and with like results as though a writ of error had been sued out to bring the original decree of the probate court into review."

The Illinois court recognized the well-established rule relating to protection to bona fide purchasers, as is disclosed by the following quotation from the opinion:

"It is a rule founded on reason and well supported by authority, that a purchaser at a judicial sale who is not a party to the record will be protected against any errors or irregularities in the proceeding anterior to the sale, provided that the court rendering such decree had jurisdiction. Innocent third parties have a right to rely upon a judgment or decree of a court having jurisdiction to pronounce it. They are not required to look beyond the question of jurisdiction, and if the decree is one which the court has jurisdiction to render, both as to subject matter and the parties, innocent purchasers acting in good faith will be protected notwithstanding the existence of errors which would cause a reversal of such decree or judgment by the court of review."

A careful analysis of the entire opinion discloses that the rule last cited would have been determinative of the controversy except for the fact that there was involved a purchase pendente lite.

The sweeping and far-reaching effect of the rule announced by the majority opinion upon outstanding titles is obvious. Judicial sales are had in mortgage and lien foreclosures, partition and probate proceedings, and others too numerous to mention. In the great majority of cases the purchasers at such sales are parties litigant. Judicial sales and purchases by parties litigant are to be found in many chains of title. Upon every such title the majority opinion in this case casts a cloud; although the judgment and sale proceedings are regular on their face, the present owners of such property are now burdened with the necessity of overcoming presumptions that the title is imperfect in the event of an attack thereon by a former owner. Specifically named, such presumptions are that the title of the litigant purchaser is defeasible, and that he purchased subject to a prior equity.

The courts often express regret at the necessity of enforcing the principle of

protection to a bona fide purchaser, for frequently it appears that the result is to work positive detriment to an owner of property who has been cheated or defrauded. See Whiteman v. Cornwell (Kan.) 164 P. 280. It is often said, however, that a recognition of such a principle is necessary in order "to give full faith and credit to judicial sales and sales made in consequence of final judgments. This is necessary in order to give final judgments the full faith and credit to which they are entitled." Van Noy v. Jackson, 68 Okla. 44, 171 P. 462. Judicial opinion is practically unanimous to the effect that a greater and more widespread detriment to titles would result if the courts should fail to give effect to the ancient principle of protection to bona fide purchasers.

In the case of Smith v. Herdlika (Ill.) 154 N. E. 414, it was held:

"Purchaser of land, ignorant of fraud on part of grantor in legal proceedings affecting title, and without notice of anything to put him on inquiry as to whether there was any such fraud, will be protected in his purchase against person claiming to have been defrauded."

In announcing the above rule of law, the Supreme Court of Illinois relied wholly upon the early case of Hunter v. Stoneburner, 92 Ill. 75. In that case it appeared that John and William Stoneburner owned 870 acres of land as tenants in common. John Stoneburner died testate leaving Samuel G. Stoneburner, his nine-year-old son, all of his real and personal property, subject to certain conditions named in the will. William Stoneburner filed a petition for partition of the 870 acres of land owned by him and the devisee of his deceased brother, John. A guardian ad litem was appointed and the court decreed a partition of the land. Commissioners were appointed and reported that the land was not susceptible of division and recommended a sale thereof. The court decreed a sale of the land, and William Stoneburner purchased the same. He thereafter sold the land to one Hunter. Samuel G. Stoneburner filed an action to set aside the sale to William Stoneburner and the sale to Hunter, charging, among other things, that the partition proceeding was fraudulent. With regard to the rights of Hunter, the purchaser from William Stoneburner, who prosecuted the partition proceeding, it was said:

"If it were conceded, or proved, that William Stoneburner procured the report of the commissioners that the lands were not susceptible of division, and procured the order of sale of the land, and purchased it, by fraud, still that would not, in the least, affect appellant's (Hunter's) title, if he purchased in good faith without actual or constructive notice of the fraud. This is a rule that is found in all of the books, and has, so far as we know, never been controverted; and the rule is so eminently just and equitable, that we are unable to conceive that it ever can be controverted, with success. To hold otherwise would be flagrantly unjust and perpetrate monstrous injustice. If, then, appellee was a bona fide purchaser from William Stoneburner, he must be protected in his purchase."

In the case of Fowler v. Poor, 93 N. C. 466, there was involved a purchase of land at an administrator's sale, by the attorney for the administrator, and a transfer from said purchaser to another. Therein it was held:

"If a judgment and sale be fraudulent and liable to be set aside as to the purchaser, an innocent party buying from such fraudulent purchaser, gets a good title."

The case of Graham v. Floyd, 214 N. C. 77, 197 S. E. 873, was an action by a minor after reaching majority for recovery of land sold in a probate proceeding for payment of debts of the estate of the minor's ancestor. One O. I. Floyd was the sole creditor of the estate and acted as guardian ad litem for the minor at the sale. The purchaser at the sale was Lydia P. Floyd, who was the wife of O. I. Floyd. The deed was executed to her on November 8, 1915, and on September 30, 1918, O. I. Floyd and Lydia P. Floyd conveyed the land to Cheston Branch and wife. The court held that O. I. Floyd was in no position to buy at the sale either

directly or indirectly, and that if he stood by and permitted his wife to buy the land at a price greatly less than its real value, the same would be evidence for consideration by a jury in passing on the issue of fraud. The following legal propositions were announced as controlling of the situation:

"The special proceeding to which the present action relates is extremely irregular, but the judgment is not void,—but voidable. By reason of the irregularities the judgment may be vacated as to all parties, unless the defendants Branch are innocent purchasers. If it should appear upon the hearing that they are purchasers for value without notice, then the plaintiff is not entitled to recover as against them. 'A purchaser for value from one whose deed was procured by fraud gets a good title if he has no notice of the fraud.' Phillips v. Lumber Co., 151 N. C. 519, 66 S. E. 603, 604; Martin v. Cowles, 18 N. C. 29; Saunders v. Lee, 101 N. C. 3, 7 S. E. 590; Odom v. Riddick, 104 N. C. 515, 10 S. E. 609, 7 L.R.A. 118, 17 Am. St. Rep. 686; Cheek v. Squires, 200 N. C. 661, 158 S. E. 198.

"It is well settled that, in the absence of fraud or the knowledge of fraud, one who purchases at a judicial sale, or who purchased from one who purchased at such sale, is required only to look to the proceeding to see if the court had jurisdiction of the parties and of the subject matter of the proceeding, and that the judgment on its face authorized the sale. Sutton v. Schonwald, 86 N. C. 198, 41 Am. Rep. 455; Morris v. Gentry, 89 N. C. 248; England v. Garner, 90 N. C. 197; Fowler v. Poor, 93 N. C. 466; Dickens v. Long, 112 N. C. 311, 17 S. E. 150; Barcello v. Hapgood, 118 N. C. 712, 24 S. E. 124; Smith v. Huffman, 132 N. C. 600, 44 S. E. 113; Millsaps v. Estes, 137 N. C. 535, 536, 50 S. E. 227, 70 L.R.A. 170, 107 Am. St. Rep. 496; Carraway v. Lassiter, 139 N. C. 145, 51 S. E. 968; Card v. Finch, 142 N. C. 140, 54 S. E. 1009. * * *

"However, if the defendant, O. I. Floyd, bought the land in question, and had the title conveyed to his wife, and they having conveyed the same to innocent purchasers, he may be charged with the full value of the land, and this without regard to the question of fraud."

The case of Haggerty v. Moyerman (Pa.) 184 Atl. 654, was an action to cancel and satisfy of record a bond and mortgage on certain real property. Plaintiff was the owner of two properties, each assessed for taxation at $6,500. The defendant, Moyerman, fraudulently procured the sale of both properties in satisfaction of a judgment in the sum of $98.18. Moyerman was attorney for the judgment creditor. We may assume that the record disclosed such fact. Both properties were sold to him at the sheriff's sale for $75. He assigned his bid to one Charles Young and sheriff's deeds to both properties were executed to Young. Young executed a mortgage on one of the properties for $4,500 and all the proceeds were paid to Moyerman. Another mortgage was executed by Young to Krakauer Building & Loan Association for $6,500, part of the money was used to satisfy the former mortgage and the balance was paid to Moyerman. Young likewise mortgaged the other property to the same company for $3,500, the proceeds of that mortgage were paid to Moyerman. In other words, Moyerman profited from these transactions to the extent of almost $10,000. This action was to cancel the mortgage for $6,500 held by defendant company. It was held that plaintiff was entitled to an accounting in the way of damages against Moyerman. With regard to the mortgage the court said:

"Although the levy and sale were a fraud on plaintiff's rights, it does not necessarily follow that plaintiff is entitled to satisfaction of the mortgage held by the defendant association. This mortgage was placed on the property by Young, and the association, in lending the money, relied upon the strength of his title. Unless the association had knowledge of Moyerman's fraud, or unless Young's title was upon its face so defective as to give notice of this fact, the association is in the position of an innocent purchaser for value, and is not to be visited with loss because of plaintiff's failure promptly to protect her interests. A purchaser of land who pays value for it, or a mortgagee who lends money upon the security of the title of a mortgagor, and who has neither actual nor constructive knowledge of any claims of third parties, holds the title or lien so acquired free of any such se-

cret equities. Stonecipher v. Keane, 268 Pa. 540, 112 A. 233; Salvation Army v. Lawson, 293 Pa. 459, 143 A. 113; Puharic v. Novy, 317 Pa. 119, 176 A. 233. This is but an application of the fundamental principle that, where one of two innocent persons must suffer, he whose neglect made the injury possible should bear the loss. Spragg v. Shriver, 25 Pa. 282, 285, 64 Am. Dec. 698; Puharic v. Novy, supra."

The case of Klinger v. Milton Holding Co. (Fla.) 186 So. 526, was an action to set aside a decree of foreclosure of a tax lien and certain conveyances based thereon. It appeared that the defendant therein had foreclosed a tax lien upon the property of plaintiff and had procured title thereto on February 11, 1932, as the purchaser at a master's sale. On August 16, 1932, the defendant conveyed the lot to Mrs. Lula Lummus. The court held that there was a lack of due diligence on the part of the plaintiff in the foreclosure suit in failing to ascertain and show in the affidavit for publication the place of residence of defendant in that suit, but it was held that the affidavit for service being valid and sufficient on the face of the record, the final decree and the action taken thereunder were not absolutely void but merely voidable. Insofar as the rights of Mrs. Lummus, the vendee of the party litigant who purchased at the tax sale, were concerned, it was held that her rights were governed by the rule announced in 35 C. J. 94, as follows:

"A bona fide grantee from a purchaser at a judicial sale is not affected by irregularities, mistakes or fraud, of which he did not have notice, although as to the grantor, sale might have been set aside."

In the case of Martin v. Robinson (Tex.) 3 S. W. 550, it was held:

"Claims against a decedent's estate having been allowed by the fraudulent collusion of the claimant and the administrator, and lands ordered sold by the court to pay the claims, the claimant purchased the lands, and afterwards sold to others. Held, in an action by the heirs of the intestate against these subsequent purchasers, the lands could not be recovered; it appearing they had been purchased bona fide, and for value, from the original purchaser, who was guilty of the fraud."

In the case of Schneider v. Sellers (Tex.) 84 S. W. 417, there was involved a set of facts quite similar to the facts involved herein. Among other issues involved was the question of whether or not a bona fide purchaser from one who had procured title from her children by a fraudulent partition action was entitled to protection. The court there solved the problem by application of the doctrine of constructive trusts. In the body of the opinion it was said:

"* * * Having secured title to the land by fraud, through the judgments entered in the district court of Ellis county, Mrs. Walker held the land charged with a constructive trust in favor of her children. 2 Pomeroy's Equity, sec. 1053. Mr. Pomeroy says: 'In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired, in favor of the one who is truly and equitably entitled to the same, although he may never, perhaps, have had any legal estate therein; and a court of equity has jurisdiction to reach the property, either in the hands of the wrongdoer, or in the hands of any subsequent holder, until a purchaser of it, in good faith and without notice, acquires a higher right, and takes the property relieved from the trust. * * *

" 'As a necessary consequence of this doctrine, whenever property subject to a trust is wrongfully sold and transferred to a bona fide purchaser, so that it is freed from the trust, the trust immediately attaches to the price and proceeds in the hands of the vendor, whether such price be a debt yet unpaid due from the purchaser, or a different kind of property taken in exchange, or even a sum of money paid to the vendor, as long as the money can be identified and reached in his hands or under his control. It is not essential for the application of this doctrine that an actual trust or fidu-

ciary relation should exist between the original wrongdoer and the beneficial owner."

The following cases are cited by the defendant and the attorneys amici curiae and involve fact situations similar to those cases to which we have referred, that is, where the rights of vendees of parties litigant who purchased at judicial sales are concerned. See Young v. Wiley (Ind.) 107 N. E. 278; Allison v. Drake (Ill.) 32 N. E. 537; Federal Land Bank of Omaha v. Tuma (Neb.) 216 N. W. 186; Stewart v. Kellough (Ohio) 135 N. E. 608; Dean v. Dean (Tex. Civ. App.) 165 S. W. 90; Doyle v. Hampton, 159 Cal. 729, 116 P. 39.

The majority opinion holds that the vendee of one who purchased under an erroneous decree in his own favor stands in the shoes of the vendor, thus nullifying to a considerable degree the doctrine of bona fide purchasers. The authorities which I have cited and from which I have quoted, in my opinion, are overwhelmingly against the statement found in the majority opinion. The controlling principle in this case has been applied by this court in the following cases: Illinois Valley Trust Co. v. Sells, 167 Okla. 58, 27 P. 2d 1945; Ross v. Groom, 90 Okla. 270, 217 P. 480; Atkinson v. King, 93 Okla. 37, 219 P. 914; McNaughton v. Lewis, 124 Okla. 181, 254 P. 972; Plant v. Shrock, 102 Okla. 97, 227 P. 439; Allison v. Crummy, 64 Okla. 20, 166 P. 691; Tootle v. Payne, 82 Okla. 178, 199 P. 201.

Under these authorities it is clear that bona fide grantee from a litigant who was a purchaser at a judicial sale is not affected by extraneous fraud practiced by his grantor of which fraud he had no notice, and that plaintiff's remedy is to proceed against the defendant Johnston.

For the above reasons, I respectfully dissent.

I am authorized to say that Chief Justice BAYLESS and Justices HURST and DAVISON concur in this dissenting view.